**UNITED STATES, Plaintiff,**

v.

**Efrain SANTOS, Defendant.**

**No. 2:01 CV 638.**

United States District Court,
N.D. Indiana,
Hammond Division.

Oct. 20, 2004.

L. Felipe Sanchez, Thomas D. Ryan, East Chicago, IN, for Efrain Santos, Plaintiff.

Philip Craig Benson, U.S. Attorney's Office—Hmd./IN, Hammond, IN, for United States of America, Defendant.

### MEMORANDUM AND ORDER

MOODY, District Judge.

Efrain Santos ("Santos" or "defendant") is a prisoner whose incarceration results

from a judgment of this court. On November 30, 2001, he initiated this post-conviction proceeding by filing a motion pursuant to 28 U.S.C. § 2255. After reviewing Santos' § 2255 motion, this court determined that additional briefing was necessary. Accordingly, the government filed a response to Santos' motion on June 9, 2003, and Santos tendered his reply on July 7, 2003. After reviewing all of the materials submitted in this matter, the court, for the following reasons, **GRANTS** Santos' § 2255 motion **IN PART.**

## I. BACKGROUND

On May 10, 1996, a federal grand jury returned a ten (10) count Indictment against Efrain Santos. (Indictment in Cause No. 2:96 CR 44, at docket # 1 [hereinafter Indictment]). The Indictment charged Santos for several acts committed in connection with his operation of an illegal lottery—known as a "Bolita"—in East Chicago, Indiana. In particular, Count 1 of the Indictment charged Santos with conspiracy to conduct an illegal gambling business in violation of 18 U.S.C. § 371; Count 2 charged Santos with conducting an illegal lottery business in violation of 18 U.S.C. § 1955; Count 3 charged Santos with conspiracy to use the proceeds of an illegal gambling business to promote the carrying on of that illegal gambling business in violation of 18 U.S.C. § 1956(h); Counts 4 and 5 charged Santos with money laundering to promote an illegal gambling business in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and, Counts 6–10 charged Santos with other substantive money laundering offenses. Santos pled not guilty to each of the Counts against him, and went to trial with three other co-defendants.

Santos' trial commenced on September 29, 1997. At trial, it was determined that Santos had begun operating his Bolita in East Chicago, Indiana in the 1970's[1] and continued to do so until approximately 1994. There was a brief period in the late 1970's and early 1980's when Santos was absent from the Bolita business, and during that time, one of Santos' co-defendants, Roberto Febus (a.k.a. Bobby Santos), served as the Bolita's interim leader. (Tr. 1548–49). However, Santos returned in 1984.

The winning numbers in Santos' Bolita were based upon the daily Pick Three and Pick Four Illinois lottery games, and upon the Puerto Rican Lottery. (Tr. 733–34). Santos had runners accept bets for his Bolita primarily in bars and restaurants in East Chicago. (Tr. 587, 620–21, 734–35). The runners would take a commission of 15–25% from the bet money, (Tr. 738–39, 909), and then deliver the betting slips and the remaining bet money to "collectors," (Tr. 735–36, 740, 747, 1397–98, 1404, 1414). The collectors would then deliver the slips and bet money to Santos, (Tr. 740–41, 1404–05), but before doing so, they would often take a "salary" out of the collected bet money, (Tr. 755–56, 1399–1400), and on occasion would pay Bolita winners who won $100.00 or less, (Tr. 739, 1426). Santos ultimately paid the Bolita's "big" winners. (Tr. 739, 1427).

The FBI began investigating Santos' Bolita in 1992, (Tr. 138–39), and on March 30, 1993, the FBI executed search warrants for Santos' person, his house, his apartment, and his vehicle, as well as for the persons and vehicles of two of Santos' collectors, (Tr. 209–10, 463). From their search, the FBI found betting slips, ledgers, cash and other evidence of Santos'

---

**1.** Before he began operating the Bolita in East Chicago, Indiana, Santos worked for Ken Eto, who ran a Bolita spanning both Illinois and Indiana in the late 1960's and early 1970's. (Tr. 1547–48). It appears Santos took over the Indiana portion of Eto's operation sometime in the early 1970's. (Tr. 1547–48).

gambling enterprise. (*See, e.g.,* Tr. 209–14, 464–66, 562, 852–55, 1415). After the FBI's search, Santos closed down his Bolita, but only for a few weeks, (Tr. 747, 1420); operations soon resumed, although the location and collection method for the Bolita had changed, (Tr. 747–48, 1419–20).

The FBI continued its surveillance of Santos' Bolita and conducted another search on June 22, 1993, (Tr. 221, 466), which returned further evidence of Santos' illegal gambling enterprise, (*see, e.g.,* Tr. 221–23, 466–67, 562, 855–56). This second search did not faze Santos, and the Bolita continued running without interruption. (Tr. 1429). The FBI then executed a third search on October 12, 1993, in which it again found betting sheets, betting slips, cash, and other evidence of Santos' illegal Bolita. (*See, e.g.,* Tr. 576–77).

After hearing all of this evidence at trial, the jury found Santos guilty on Counts 1–5 of the Indictment, and not guilty on Counts 6–10. (Tr. 2142; Minute Entry in Cause No. 2:96 CR 44, at docket # 261). As a result of the guilty verdicts, on April 15, 1998, this court sentenced Santos to 60 months on each of Counts 1 and 2, and to a term of imprisonment of 210 months on each of Counts 3, 4, and 5, all to be served concurrently. (Minute Entry in Cause No. 2:96 CR 44, at docket # 379). After receiving his sentence, Santos promptly filed his Notice of Appeal on April 23, 1998. (Notice of Appeal in Cause No. 2:96 CR 44, at docket # 390).

On appeal, Santos presented only one issue for review: He argued that "the evidence was insufficient to convict him of money laundering because his cash payment to the bolita's collectors and winners were essential transactions of the illegal gambling business, and thus cannot also constitute transactions under" § 1956(a)(1)(A)(i)[2]. *United States v. Febus,* 218 F.3d 784, 789 (7th Cir.2000). The Court of Appeals rejected Santos argument and affirmed his conviction. The Court stated:

> In this case, the government established that Santos reinvested the bolita's proceeds to ensure its continued operation for over 5 years, well beyond the 30 days required to complete the substantive offense of illegal gambling under 18 U.S.C. § 1955. Furthermore, [Santos'] own records show that the income to his bolita expanded from approximately $250,000.00 per year for the years 1989 to 1992, to $330,000.00 for 1993, and up to $410,000.00 for 1994. His payments to his collectors, Diaz and Morales, compensated them for collecting the increased revenues and transferring those funds back to him. And his payments to the winning players promoted the bolita's continuing prosperity by maintaining and increasing the players' patronage. (citation omitted). Therefore, the government produced sufficient evidence to enable a reasonable jury to find Santos guilty of money laundering beyond a reasonable doubt.

*Id.* at 790. Shortly after the Seventh Circuit's decision affirming Santos' conviction, Santos filed a petition for a *Writ of Certio-*

---

**2.** Section 1956(a)(1)(A)(i) provides, in pertinent part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity;

\* \* \* \* \* \*

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

*rari.* However, the United States Supreme Court declined review. *Santos v. United States,* 531 U.S. 1021, 121 S.Ct. 587, 148 L.Ed.2d 503 (2000).

Thus, on November 30, 2001, Santos filed the instant motion requesting that this court vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. (Def.'s § 2255 Mot. in Cause No. 2:01 CV 638, at docket # 9 [hereinafter Def.'s § 2255 Mot.] ).[3] The undersigned engaged in the prescribed initial consideration, (*see* RULES GOVERNING SECTION 2255 PROCEEDINGS, RULE 4(b)), and subsequently directed the United States Attorney to enter his appearance and file an Answer by January 11, 2002. (Order dated Dec. 10, 2001 in Cause No. 2:01 CV 638, at docket # 2). However, due to a delay caused by several continuances arising out of the Seventh Circuit's decision in *United States v. Scialabba,* 282 F.3d 475 (7th Cir.2002)—an opinion which the government originally suspected conflicted with the Seventh Circuit's holding in Santos' direct appeal—the government did not tender its response until June 9, 2003. (Gov't Resp. in Cause No. 2:01 CV 638, at docket # 41 [hereinafter Gov't Resp.] ). Santos then filed his reply on July 7, 2003. (Def.'s Reply in Cause No. 2:01 CV 638, at docket # 42 [hereinafter Def.'s Reply] ). The court

shall now address the merits of Santos' motion.

## II. STANDARD OF REVIEW

■■■ "No prisoner has a constitutional entitlement to further review of the final judgment in a criminal case." *Farmer v. Litscher,* 303 F.3d 840, 844 (7th Cir.2002) (citing *Freeman v. Page,* 208 F.3d 572, 576 (7th Cir.2000)). However, with the enactment of 28 U.S.C. § 2255, Congress gave federal prisoners a right to launch a collateral attack against their conviction. Section 2255 ultimately grants the federal courts power "to vacate, set aside or correct the sentence" of a convicted prisoner, 28 U.S.C. § 2255 ¶ 1, but only if the prisoner is able to expose flaws in the conviction "which are jurisdictional in nature, constitutional in magnitude, or result in a complete miscarriage of justice," *Boyer v. United States,* 55 F.3d 296, 298 (7th Cir. 1995) (citation omitted). Thus, "relief under 28 U.S.C. § 2255 is reserved for extraordinary situations." *Prewitt v. United States,* 83 F.3d 812, 816 (7th Cir.1996) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 633–34, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).[4]

■■ A post-conviction proceeding under § 2255 "is not to be used as a substitute for a direct appeal." *United States v.*

---

3. The original § 2255 motion filed by Santos on November 30, 2001, (*see* Cause No. 2:01 CV 638, at docket # 1), failed to comply with LOCAL RULE 47.1 which requires that all § 2255 motions be filed upon the "form contained in the Rules following ... 28 U.S.C. § 2255." N.D. IND. L. CR. R. 47.1. Therefore, in an Order dated January 18, 2002, this court directed the Clerk to furnish Santos with a copy of the applicable form, and ordered Santos to comply with the LOCAL RULE no later than March 1, 2002. (Order dated Jan. 18, 2002 in Cause No. 2:01 CV 638, at docket # 7). The January 18 Order also noted that this court would construe Santos' original § 2255 filing as Memorandum of Law. (Order dated Jan. 18, 2002 in Cause No.

2:01 CV 638, at docket # 7). Santos promptly complied with this court's January 18 Order, and thus, his "proper" § 2255 motion appears at docket # 9 in Cause No. 2:01 CV 638.

4. Emphasizing the social benefit of finality and advancing a jurisprudence of limited post conviction success, the United States Supreme Court has stated:

> Once the defendant's chance to appeal has been waived or exhausted, ... [the court is] entitled to presume he stands fairly and finally convicted, especially when, as here, he already has had a fair opportunity to present his federal claims to a federal forum. Our trial and appellate procedures

*Barger,* 178 F.3d 844, 848 (7th Cir.1999) (citing *Theodorou v. United States,* 887 F.2d 1336, 1339 (7th Cir.1989)); *accord Coleman v. United States,* 318 F.3d 754, 760 (7th Cir.2003). Accordingly, the doctrine of procedural default precludes the district court from considering certain claims presented in a § 2255 motion that the defendant could have raised on direct appeal, unless the defendant "can show good cause for failing to raise the issue[s] and actual prejudice." *Galbraith v. United States,* 313 F.3d 1001, 1006 (7th Cir. 2002); *accord Mankarious v. United States,* 282 F.3d 940, 943 (7th Cir.2002) ("An issue not raised on direct appeal is barred from collateral review absent a showing of both good cause for and actual prejudice resulting from the failure to assert it."), *cert. denied,* 537 U.S. 823, 123 S.Ct. 108, 154 L.Ed.2d 32 (2002). "A showing that a refusal to consider the issue would be a fundamental miscarriage of justice" may also aid a prisoner in attaining review of a procedurally defaulted is-

sue. *Galbraith,* 313 F.3d at 1006 (internal quotation marks and citation omitted).

## III. DISCUSSION

Santos presents four (4) arguments for relief in his § 2255 motion. He generally alleges: (1) that he received ineffective assistance of counsel; (2) that the court imposed a sentence in excess of the maximum authorized by law; (3) that his sentence was imposed in violation of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and, (4) that the opinion expressed by the Seventh Circuit in *Scialabba,* 282 F.3d 475, (a case decided subsequent to Santos' appeal), requires that his convictions for money laundering be set aside and that he be re-sentenced.[5] The court shall now address the merit of each of Santos' contentions.

### A. Ineffective Assistance of Counsel Claims

■ Santos makes three (3) general claims of ineffective assistance of counsel.

are not so unreliable that we may not afford their completed operation any binding effect beyond the next in a series of endless postconviction collateral attacks. To the contrary, *a final judgment commands respect. United States v. Frady,* 456 U.S. 152, 164–65[, 102 S.Ct. 1584, 71 L.Ed.2d 816] (1982) (emphasis added).

5. Santos' § 2255 motion, which he originally filed *pro se,* is quite jumbled and disorganized, thus, it was somewhat difficult for this court to extricate (from the jumble) the actual issues Santos had presented for review under § 2255. In the end, in an order dated December 10, 2001, this court determined that Santos' motion presented three (3) coherent arguments for relief: (1) that his trial counsel was constitutionally ineffective; (2) that this court imposed upon him a sentence in excess of the maximum authorized by law; and, (3) that the decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), entitles him to collateral relief. (Order dated Dec. 10, 2001 in Cause No. 2:01 CV 638, at docket # 2). Approximately three

(3) months after this court issued its December 10, 2001 Order, the United States Attorney's Office brought to this court's attention the decision in *United States v. Scialabba,* 282 F.3d 475 (7th Cir.2002), which it believed might impact the disposition of Santos' § 2255 request for relief; thus, a fourth issue for review—whether the decision in *Scialabba* requires Santos' money laundering convictions to be set aside—was ostensibly added to the three others presented by Santos in his original § 2255 motion. Both parties have since agreed that there are indeed four (4) questions presented for review in this § 2255 action: (1) whether Santos received ineffective assistance of counsel; (2) whether the court imposed upon Santos a sentence in excess of the maximum authorized by law; (3) whether Santos' sentence was imposed in violation of *Apprendi;* and, (4) whether the opinion expressed by the Seventh Circuit in *Scialabba* requires that Santos' money laundering convictions be set aside and that he be re-sentenced. (*See* Gov't Resp., at 10–11; Def.'s Reply, at 5).

He argues: (1) that his trial attorney, Nick Thiros, provided ineffective assistance by failing to object to the Pre–Sentence Investigation Report ("PSI"); (2) that Mr. Thiros provided ineffective assistance by failing to investigate the criminal statutes under which Santos was convicted; and, (3) that Mr. Thiros provided ineffective assistance by failing to object to this court's jurisdiction over Santos' criminal matter.[6] In seeking to prove that his counsel rendered ineffective assistance in these three (3) instances, Santos "bears a heavy burden." *Jones v. Page*, 76 F.3d 831, 840 (7th Cir.1996) (citation omitted). Santos must show: (1) that his counsel's performance in the specified situation(s) was unreasonably deficient; and, (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As the *Strickland* standard is formulated in the conjunctive, Santos must make the requisite showing on both elements; failure to prove either deficient conduct or prejudice invalidates an ineffective assistance claim, *see Rastafari v. Anderson*, 278 F.3d 673, 688 (7th Cir.2002) ("A failure to establish either [*Strickland*] prong results in a denial of the ineffective assistance of counsel claim.") (citation omitted), *cert. denied sub nomine Rastafari v. Davis*, 537 U.S. 914, 123 S.Ct. 294, 154 L.Ed.2d 196 (2002).

When considering whether an attorney's conduct was unreasonably deficient under the first prong of the *Strickland* test, a court must operate under a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and treat counsel's performance with high deference. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *accord Williams v. Washington*, 59 F.3d 673, 679 (7th Cir.1995) (The first prong of *Strickland* "contemplates deference to strategic decision-making."). In order to prevail on the first prong of the *Strickland* test, a defendant must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. With regard to the second prong, the court will only disturb a criminal conviction if "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. In other words, "[i]n order to demonstrate that his federal constitutional right to effective assistance of counsel was violated, a defendant must show that effective assistance would have given him a reasonable shot at acquittal." *Gibbs v. VanNatta*, 329 F.3d 582, 584 (7th Cir.2003) (noting that this is a "different and lower standard" than proving actual innocence); *accord*

---

**6.** Although Santos has never before, in any court, raised any of these ineffective assistance claims, it matters little in as far as claims of ineffective assistance are not prone to procedural default. *Massaro v. United States*, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003). Rather, ineffective assistance claims may be properly raised for the first time in a § 2255 proceeding. *Id.* ("We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal."); *accord United States v. Woolley*, 123 F.3d 627, 634 (7th Cir.1997) ("The preferred method for raising a claim of ineffective assistance of counsel is either by bringing a motion for new trial or a request for collateral relief under 28 U.S.C. § 2255.") (internal quotation marks and citation omitted); *Jones v. United States*, 264 F.Supp.2d 714, 716 (N.D.Ill.2003) ("The Court in *Massaro* made clear ... that ineffective assistance of counsel claims are an exception [to the procedural default rules] ... and may be brought in a collateral proceeding under § 2255."). Therefore, Santos has appropriately raised his ineffective assistance claims for the first time in this § 2255 proceeding.

*Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.").

### 1. *Failing to Object to the PSI*

■ Santos first contends that Mr. Thiros provided ineffective assistance by failing to object to the PSI report. (Def.'s § 2255 Mem., at 5)[7]. Yet, Mr. Thiros *did* make three (3) vigorous objections to the PSI. First, Mr. Thiros argued against the PSI's representation of both the amount of time Santos had been part of the Bolita, (Sent. Tr. 52–53), and the amount of money involved in the gambling operation, (Sent. Tr. 53–54). Second, Mr. Thiros objected to sentence enhancements premised upon (what Santos believed to be) erroneous representations of the time Santos operated the Bolita and the amount of money involved in the Bolita's operation. Finally, Mr. Thiros took issue with "whether or not the money laundering or the gambling operation is the [offense] that the court should take into consideration in determining the appropriate guideline level." (Sent. Tr. 55–58). Not only did Mr. Thiros make these objections generally, he presented both testimonial and documentary evidence in support of his objections at Santos' sentencing hearing.[8] Thus, the general claim that Mr. Thiros failed to make objections to the PSI is, in and of itself, false.

However, perhaps Santos' claim is not as general as it appears. Santos' Memorandum in Support of his § 2255 motion does not, in the section entitled "Ineffective Assistance of Counsel," specify to what exactly in the PSI Santos believes Mr. Thiros should have objected. (*See* Def.'s § 2255 Mem., at 5). Yet, in a previous section in his § 2255 motion, Santos argues that the PSI report was improperly prepared and inaccurate. In particular, Santos argues that the PSI inaccurately reported the maximum sentence permitted for his convictions under § 1956(a)(1)(A)(i)[9] and § 1956(h)[10] as twenty (20) years, when according to Santos, the correct maximum sentence is 46 to 57 months. (Def.'s § 2255 Mem., at 2–3). Thus, maybe Santos believes Mr. Thiros should have objected to this alleged inaccuracy.

However, § 1956(a)(1)(A)(i) *clearly* indicates that one who is found guilty of violating the statute "shall be sentenced to ... *imprisonment for not more than twenty years.*" (emphasis added). The maximum penalty for § 1956(h) is also *clearly* twenty (20) years in this instance. Indeed, § 1956(h) states:

> Any person who conspires to commit any offense defined in [§ 1956] ... shall be subject to the *same penalties as those prescribed for the offense the com-*

---

7. The citation "Def.'s § 2255 Mem. at ___" references the Memorandum of Law attached to Santos' § 2255 motion in Cause No. 2:01 CV 638, at docket # 9.

8. In support of his objections to the PSI, Mr. Thiros first presented the testimony of two witnesses, Angel Morales, (Sent. Tr. 8–16), and Efrain Santos, (Sent. Tr. 34–48), and then submitted, as an exhibit, tax documents allegedly proving the year in which Santos became involved in the Bolita operation, (Sent. Tr. 40).

9. For the text of § 1956(a)(1)(A)(i), *see supra* note 2.

10. Section 1956(h) states, in pertinent part:

> Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

*mission of which was the object of the conspiracy.*

(emphasis added). Thus, as the "object of the conspiracy" was the offense for which Santos was convicted under § 1956(a)(1)(A)(i), (*see* Indictment, at Count 3), then the appropriate penalty for conviction under § 1956(h) is a maximum of twenty (20) years. Therefore, the inaccuracy within the PSI that Santos suggests existed did not in fact exist, and Mr. Thiros cannot be found ineffective for failing to object to the PSI's correct representation of the penalty for the crimes of which Santos was convicted.

Santos also appears to believe that perhaps Mr. Thiros should have objected to the validity of a prior conviction used to enhance Santos' current sentence. (*See* Def.'s § 2255 Mem., at 4). Santos asserts that his 1966 conviction for "conspiracy to transfer and possess untaxed Marijuana," which was used to enhance his current sentence by three (3) points, is invalid because "courts have since ruled that no one is to be prosecuted for possession of untaxed marijuana." (Def.'s § 2255 Mem., at 4). Accordingly, Santos argues that his sentence should never have been enhanced based upon the invalid 1966 conviction, and presumably, Mr. Thiros should have raised this issue with the court. (Def.'s § 2255 Mem., at 4).

However, "the validity of prior convictions is not open to reexamination at sentencing for a new offense," *Talbott v. Indiana,* 226 F.3d 866, 870 (7th Cir.2000); such is the case even if those prior convictions are used to enhance the sentence for the new offense, *id.* "This [general] rule is subject to *only one* exception: If an enhanced federal sentence will be based in part on a prior conviction obtained in violation of the right to counsel, the defendant may challenge the validity of his prior conviction during his federal sentencing proceedings. (citation omitted). *No other constitutional challenge to a prior conviction may be raised in the sentencing forum.* (citation omitted)." *Daniels v. United States,* 532 U.S. 374, 382, 121 S.Ct. 1578, 149 L.Ed.2d 590 (2001) (emphasis added); *see also Talbott,* 226 F.3d at 870. Santos does not now allege, nor has he ever alleged, and there is no evidence to suggest, that Santos lacked counsel when convicted in 1966. Therefore, Santos fails to meet the one exception to the general rule that "sentencing hearings are not the appropriate forum to examine the validity of prior convictions even though such convictions may be used to enhance a present sentence." *United States v. Mitchell,* 18 F.3d 1355, 1358 (7th Cir.1994). Consequently, Mr. Thiros did not render ineffective assistance by failing to object to the validity of Santos' 1966 conviction at Santos' latest sentencing; one can hardly be deemed ineffective for following the rules.[11]

---

**11.** Moving beyond the scope of Santos' ineffective assistance claim for just a moment, it is important to note that federal prisoners are generally *barred* from challenging a current sentence through a motion under § 2255 on the ground that the sentence was inappropriately enhanced by an allegedly invalid prior conviction. *See Daniels v. United States,* 532 U.S. 374, 382, 121 S.Ct. 1578, 149 L.Ed.2d 590 (2001); *accord Ryan v. United States,* 214 F.3d 877, 879–80 (7th Cir.2000). Of course, this rule is also subject to the "lack of counsel" exception. *Daniels,* 532 U.S. at 382–83, 121 S.Ct. 1578 (defendant may, in a § 2255 proceeding, challenge a prior conviction used to enhance his current federal sentence if that prior conviction was imposed in violation of defendant's Sixth Amendment right to counsel). However, because "lack of counsel" claims are subject to procedural default rules, a defendant may generally only raise such a claim in his § 2255 motion "if he raised that claim at his federal sentencing proceeding." *Id.* at 382–83, 121 S.Ct. 1578 (citations omitted). In any event, as discussed above, Santos does not now allege, nor has he ever alleged, and the evidence does not suggest, that his 1966 conviction was imposed in violation of his Sixth Amendment right to coun-

### 2. Failing to Investigate Criminal Statutes

 Second, Santos claims that Mr. Thiros provided ineffective assistance by failing to investigate the criminal statues under which Santos was convicted. (Def.'s § 2255 Mem., at 5). Santos first argues that had Mr. Thiros investigated the criminal statutes listed in the Indictment, Mr. Thiros would have found that 18 U.S.C. § 371 is a "non-promulgated" statute. (Def.'s § 2255 Mem., at 6). Santos never explains what he means when he says § 371 is a "non-promulgated" statute, nor does he explain why or how this issue might be important to or affect his case. However, based upon the context in which the phrase "non-promulgated" appears, it seems Santos uses the phrase to mean that Congress has never "enacted," or rather, "executed" § 371, and therefore § 371 does not have the force of law. See WEBSTER'S NEW INT'L DICTIONARY 1816 (3d ed. 1981) ("Promulgate" is defined as: "b: to issue or give out (a law) by way of putting into execution."). If this is in fact what Santos means, then he is wrong. Section 371 was indeed "promulgated," or rather, "enacted" by Congress in 1948, and it does carry the force of law. See Act of June 25, 1948, ch. 645, 62 Stat. 701, amended by Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 2147. Accordingly, Mr. Thiros was not ineffective for failing to investigate the non-issue of § 371's "promulgation."

Santos next argues that all sections of the Federal Criminal Code are only punishable in Washington, D.C. and the territories of the United States. (Def.'s § 2255 Mem., at 5–6). Therefore, Santos contends, not one of the statutes under which he was convicted was actually enforceable against him, and because Mr. Thiros failed

to notice this, Mr. Thiros rendered ineffective assistance. (Def.'s § 2255 Mem., at 5–6). The Seventh Circuit has repeatedly refused to endorse this argument, calling it "frivolous and requir[ing] no further discussion." United States v. Banks–Giombetti, 245 F.3d 949, 953 (7th Cir.2001) (refusing to discuss argument that federal government had no authority to prosecute bank robbery not committed on federal land); United States v. Jones, 983 F.2d 1425, 1428 & n. 6 (7th Cir.1993) (calling "plainly frivolous" the argument that defendant was a citizen of the sovereignty of Texas and thus not subject to the jurisdiction of the United States on federal bond-jumping charges). Accordingly, this court will not endorse such an argument either.

### 3. Failing to Object to Jurisdiction

 Lastly, Santos argues that Mr. Thiros was ineffective in failing to object to this court's jurisdiction over his criminal matter. (Def.'s § 2255 Mem., at 5–6). Pursuant to 18 U.S.C. § 3231, this court has "original jurisdiction exclusive of the courts of the States, of all offenses against the laws of the United States." In the present case, Santos was charged with and convicted of violating 18 U.S.C. § 371 (conspiracy to conduct an illegal gambling business), 18 U.S.C. § 1955 (conducting an illegal lottery business), 18 U.S.C. § 1956(h) (conspiracy to use proceeds of an illegal gambling business to promote the carrying on of that business), and 18 U.S.C. § 1956(a)(1)(A)(i) (money laundering). Each of these offenses has been defined by Act of Congress as a crime against the laws of the United States. See Pennsylvania v. Nelson, 350 U.S. 497, 519, 76 S.Ct. 477, 100 L.Ed. 640 (1956) (Title 18 of the United States Code "codifies the

sel. As a consequence, Santos may not now appropriately challenge the imposition of the enhancement to his current sentence by col-

laterally attacking the validity of his 1966 conviction which supported that enhancement.

federal criminal laws."). Therefore, this court unquestionably had jurisdiction over Santos' case, and Mr. Thiros was not ineffective in failing to object to a jurisdictional issue that did not exist.

### B. *Excessive Sentence Claim*

■■ Santos next contends that the court imposed upon him a sentence in excess of the maximum authorized by law. (Def.'s § 2255 Mot., at 5 ¶ B; Def.'s § 2255 Mem., at 2–3). Santos argues that the PSI inaccurately reported the maximum sentence permitted for his convictions under § 1956(a)(1)(A)(i) and § 1956(h) as twenty (20) years, when according to Santos, the correct maximum sentence is 46 to 57 months. (Def.'s § 2255 Mot., at 5 ¶ B; Def.'s § 2255 Mem., at 2–3). The court has already addressed the merit of this argument in the previous section, although it did so in the context of an ineffective assistance analysis. Nonetheless, no matter what context this argument is analyzed in, it must fail.

As the court explained above, § 1956(a)(1)(A)(i) clearly indicates that those who have engaged in conduct which violates the statute "shall be sentenced to . . . imprisonment for not more than twenty years." Section 1956(h) subjects those convicted under its provisions "to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." Thus, given that the "object of the conspiracy" was the offense for which Santos was convicted under § 1956(a)(1)(A)(i), (*see* Indictment, at Count 3), § 1956(h), in this instance, also carries a maximum penalty of twenty (20) years.

Santos was sentenced to 210 months (17.5 years) for his conviction under § 1956(h), and 210 months for each of the two convictions under § 1956(a)(1)(A)(i) (all to be served concurrently). Accordingly, Santos did not receive a sentence in excess of the maximum authorized by law for the crimes of which he was convicted under § 1956(h) and § 1956(a)(1)(A)(i). Rather, he received two and one-half years less than the maximum. Thus, this court denies Santos' request to vacate his sentence based upon his contention that the penalties he received for his convictions under § 1956(h) and § 1956(a)(1)(A)(i) exceed the maximum prescribed by law; such a contention is simply false.

### C. *Apprendi Claim*

■■ Third, Santos argues that this court must vacate his sentence pursuant to *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348. (Def.'s § 2255 Mot., at 6 ¶ 13; Def.'s § 2255 Mem., at 8–9). *Apprendi* ultimately requires that "[o]ther than the fact of a prior conviction, any fact which increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490 (emphasis added).[12] Santos specifically asserts that this court violated *Apprendi* by wrongfully determining facts which resulted in a term of imprisonment fifteen (15) years beyond the prescribed statutory maximum of (what Santos argues is) five (5) years for his conviction under § 1956(h). (Def.'s § 2255 Mot., at 6 ¶ 13; Def.'s § 2255 Mem., at 8–9).

■■ As this court has already explained several times over, Santos has sim-

---

**12.** The rule announced in *Apprendi* is not applicable to sentences that became final *before* June 26, 2000, the date of *Apprendi's* release. *Curtis v. United States*, 294 F.3d 841, 844 (7th Cir.2002) ("*Apprendi* [] does not disturb sentences that became final before June 26, 2000, the date of its release."). However, as Santos' conviction became final approximately one (1) month *after* the date of *Apprendi's* release, the rule announced in *Apprendi* may be appropriately applied to his case. *See id.*

ply got it wrong; the statutory maximum under § 1956(h) is NOT only five (5) years. Once again, § 1956(h) prescribes the "same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." The object of the conspiracy in this case was the laundering of monetary instruments, the offense for which Santos was convicted under § 1956(a)(1)(A)(i). (*See* Indictment, at Count 3). As the statutory maximum under § 1956(a)(1)(A)(i) is twenty (20) years, then the statutory maximum under § 1956(h), in this instance, is also twenty (20) years. Thus, this court did not, as Santos contends, sentence Santos fifteen (15) years beyond the maximum number of years of imprisonment listed in § 1956(h). Nevertheless, ignoring for the moment that Santos' *Apprendi* claim is entirely based upon an incorrect understanding of the statutory maximum prescribed by § 1956(h), and assuming that Santos simply believes his case generally presents an *Apprendi* issue, the court notes that because Santos raises his *Apprendi* issue for the first time in a collateral attack on his conviction, he must now show *both* cause for failing to raise the issue at trial and on direct appeal, and prejudice resulting from that failure in order to avoid procedural default of the issue. *Galbraith,* 313 F.3d at 1006; *Mankarious,* 282 F.3d at 943.

Santos has not bothered to present any reasons for failing to raise his *Apprendi* issue in previous proceedings. Therefore, Santos has not demonstrated the "cause" necessary to avoid procedural default. Certainly, one might logically ask how it is that Santos could have presented his *Apprendi* claim before the instant proceeding considering that his conviction became final on July 14, 2000, only one (1) month after *Apprendi* was decided. The Court of Appeals has observed, however, that the "foundation for *Apprendi* was laid long before 1992," and that defendants have

been "making *Apprendi*-like arguments ever since the Sentencing Guidelines came into being." *United States v. Smith,* 241 F.3d 546, 548 (7th Cir.2001). In other words, nothing stopped Santos from making an "*Apprendi*-like" argument before this collateral proceeding, and his failure to do so is the forfeiture that leads to a cause and prejudice requirement.

Of course, given that *Apprendi*-like arguments have, apparently, long been in existence, it would seem that perhaps Santos might, or even should be able to raise a claim of ineffective assistance based upon his attorney's failure to raise an *Apprendi*-like argument on Santos' behalf at some point during Santos' criminal proceedings; an ineffective assistance claim could ultimately serve as "cause" for procedural default purposes, *see Murray v. Carrier,* 477 U.S. 478, 488–89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) ("Ineffective assistance of counsel ... is cause for a procedural default."). Yet, the Court of Appeals has noted on more than one occasion that a claim that counsel was ineffective for failing to anticipate *Apprendi* is untenable because "[t]he Sixth Amendment does not require counsel to forecast changes or advances in the law." *Lilly v. Gilmore,* 988 F.2d 783, 786 (7th Cir.1993); *see also Valenzuela v. United States,* 261 F.3d 694, 700 (7th Cir.2001); *Smith,* 241 F.3d at 548. The lack of *any* reasonable legal basis for raising a claim can be "cause," *Reed v. Ross,* 468 U.S. 1, 16, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984), but, as noted above, the Court of Appeals has already determined that the foundation for *Apprendi* was apparent well before 1992. *Smith,* 241 F.3d at 548. As a result, Santos cannot establish "cause" excusing the forfeiture of his *Apprendi* claim. *See Bousley v. United States,* 523 U.S. 614, 622–23, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998); *Smith,* 241 F.3d at 548. Thus, Santos' *Apprendi* claim must fail. *See Mankarious,* 282 F.3d at 943 ("An issue not raised on direct appeal

is barred from collateral review absent a showing of *both* good cause for and actual prejudice resulting from the failure to assert it.") (emphasis added).[13]

### D. Scialabba Claim

Finally, Santos contends that the Seventh Circuit's opinion in *Scialabba,* 282 F.3d 475, decided subsequent to Santos' direct appeal, requires that his money laundering convictions under § 1956(a)(1)(A)(i) and § 1956(h) be set aside and that he be re-sentenced. (*See generally* Def.'s Reply). The relevant facts of *Scialabba,* as the government notes, are "amazingly similar" to those of Santos' case. (Gov't Resp., at 22). Indeed, like Santos, defendant Scialabba, along with his co-defendant Cechini, ran an illegal gambling business. *Scialabba,* 282 F.3d at 475. Their business ultimately involved providing video poker machines to bars, restaurants, etc. *Id.* Bar/restaurant patrons would play the poker machines, and when they won, patrons could, if they so chose, (lawfully) use their winning video credits to continue playing video poker, or they could (unlawfully) redeem their video credits for cash. *Id.* at 475–76. Scialabba and Cechini used the contents of the video poker coin boxes (filled with the money of video poker players) to compensate bar/restaurant owners for their role in the business and for any payments made to winning customers, and to fix or replace broken or confiscated video poker machines. *Id.* at 476. As a result of Scialabba's and Cechini's activities—in particular, their act of sharing the contents of the coin boxes with bar/restaurant owners and their use of video poker revenues to lease and fix equipment—they, like Santos, were convicted of money laundering under § 1956(a)(1)(A)(i). *Id.*

The over-arching question presented by *Scialabba* was whether the term "proceeds," as used in § 1956(a)(1),[14] "refers to the gross income from an offense, or only the net income." *Id.* at 475. The Court determined that the money laundering convictions of the *Scialabba* defendants "depend[ed] on the proposition that gross income is proceeds under [§ 1956]." *Id.* at 476. This determination sprang from the government's argument that Scialabba and Cechini violated the plain meaning of § 1956 by sharing the money collected from the gambling machine coin boxes with bar/restaurant owners and by using the coin box monies to meet the expenses of their gambling business (i.e., by leasing video poker machines and/or obtaining amusement licenses). *Id.* The Court equated such an argument with "saying that every drug dealer commits money laundering by using the receipts from sales to purchase more stock in trade, that a bank robber commits money laundering by us-

---

**13.** This court suspects that Santos (and anyone in his shoes) might feel that the precedent discussed above puts him between a rock and a hard place. On the one hand, Santos must show cause for failing to make an *Apprendi*-like argument because *Apprendi's* foundation was apparent. On the other hand, his attorney's apparent failure to notice and build on that foundation is not ineffectiveness constituting "cause" because attorneys are not required to forecast changes in the law. Perhaps this seeming contradiction can be explained by noting that an effective attorney must choose the best issues to pursue on appeal, and is not ineffective for fail-

ing to pursue every non-frivolous issue. *Mason v. Hanks,* 97 F.3d 887, 893 (7th Cir.1996). In this vein, an attorney cannot be expected to argue for reversal of every negative precedent. Thus, unless an issue looming on the horizon is so obvious that no attorney in his or her right mind would fail to raise it, an attorney's failure to argue for a change or advance in the law should always be deemed a valid strategic choice, whether or not consciously pursued.

**14.** For the text of § 1956(a)(1)(A)(i), *see supra* note 2.

ing part of the loot from one heist to rent a getaway car for the next, and so on." *Id.*

The Court ultimately thought that "[t]reating the word [proceeds] as a synonym for receipts could produce odd outcomes." *Id.* at 477. It reasoned as follows:

> Consider a slot machine in a properly licensed casino. Gamblers insert coins, and the machine itself returns some of them as winnings. Later the casino opens the machine and removes the remaining coins. What are the "proceeds" of this one-armed bandit: what's left in the cash box, or the total that entered through the coin slot? At oral argument the prosecutor sensibly replied that the "proceeds" do not exceed what's left after gamblers have received their jackpots; yet the only difference between the slot machine and the video poker machine is that the slot machine is automated and pays gamblers directly. Likewise, one would suppose, the "proceeds" of drug dealing are the *profits* of that activity (the sums available for investment outside drug markets), the net yield rather than the gross receipts that must be used to buy inventory and pay the wages of couriers. It would have been easy enough to write "receipts" in lieu of "proceeds" in § 1956(a)(1); the Rule of Lenity counsels against transmuting the latter into the former and catching people by surprise in the process.
>
> ... If [ ] the word "proceeds" is synonymous with gross income, then we would have to decide whether, as a matter of statutory construction (distinct from double jeopardy), it is appropriate to convict a person of multiple offenses when the transactions that violate one statute necessarily violate another. (cita-

tions omitted). By reading § 1956(a)(1) to cover only transactions involving profits, we curtail the overlap and ensure that the statutes may be applied independently to sequential steps in a criminal enterprise.

*Id.* (all marks and italics in original). In the end, the *Scialabba* Court held that "at least when the crime entails voluntary, business-like operations, 'proceeds' must be *net income;* otherwise the predicate crime merges into money laundering (for no business can be carried on without expenses) and the word 'proceeds' loses operational significance." *Id.* at 475 (emphasis added). As a consequence of this holding, the *Scialabba* Court vacated the money laundering convictions of Scialabba and Cechini (after all, as noted above, the convictions of the *Scialabba* defendants had depended upon the proposition that gross income was proceeds under the statute). *Id.* at 476, 478.

It is this decision that has prompted Santos to argue that his money laundering convictions can no longer stand. Santos wonders how it can be that his use of gambling "proceeds" to pay both winning customers and money collectors constituted money laundering, *see Febus,* 218 F.3d at 790, while the remarkably similar acts of Scialabba and Cechini, which involved compensating bar owners for payments to winners and for their compliance in the gambling scheme, did not constitute money laundering, *see Scialabba,* 282 F.3d at 476–78. Santos ultimately argues that the *Scialabba* decision (and its interpretation of § 1956(a)(1)) is now the "law of the circuit." (Def.'s Reply, at 9). Thus, Santos contends, this court must apply that law to his case and set aside his money laundering convictions. (Def.'s Reply, at 9).[15]

---

**15.** The court thinks it important to note that Santos' reply brief did not clearly set forth Santos' arguments, nor did it provide this court with ANY law supporting his position. Rather, the brief matter-of-factly states that

The government responds rather simply by arguing that the *Scialabba* decision does not impact, or does not control the decision in Santos' case because *Scialabba* did not overrule the holding in *Febus*. (Gov't Resp., at 26–29).[16] The government supports this argument first by noting that in order for the decision of one panel to overrule that of another, the panel deciding the more recent case must, pursuant to RULE 40(e) of the CIRCUIT RULES OF THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT [hereinafter CIR. RULE 40(e)],[17] "recognize the prior decision which it seeks to overrule, and circulate the new proposed opinion to the full court prior to the issuance of the new opinion." (Gov't Resp., at 26–27). The government then points out that there is no evidence to suggest that the *Scialabba* panel followed the requirements of CIR. RULE 40(e), and therefore, "clearly *Scialabba* was not meant to overrule [Santos' case]." (Gov't Resp., at 28). Thus, the government contends, "Santos' case is still good law;" and accordingly, this court must abide by that law. (Gov't Resp., at 29).

It may be that the *Scialabba* panel did not follow the dictates of CIR. RULE 40(e) in this case,[18] but this court is unsure why that matters considering that *Scialabba* and *Febus* did not decide the same question. Indeed, while the *Scialabba* Court concerned itself with the interpretation of the term "proceeds," as used in § 1956(a)(1), the *Febus* Court was not asked to, and therefore did not decided *anything* about the term "proceeds."[19]

*Scialabba* applies to Santos' case and then goes on to attack the government's brief writing without ever really explaining why the government's position is (presumably) incorrect. Were Santos currently proceeding *pro se,* this court could forgive the deficiencies in his brief, but he is not. The court reminds Santos' attorneys that it is their job to clearly and concisely present their client's position and to support that position with law.

**16.** The government also argues, in the alternative, that the Seventh Circuit simply "got it wrong" in *Scialabba.* The government asserts: (1) that interpreting the term "proceeds" as *net* proceeds "is contrary to the word's most common and primary meaning;" (2) that such an interpretation will severely hamper federal efforts to curtail organized crime, drug trafficking and business fraud; and, (3) that the Court's interpretation of "proceeds" departs from the approach of other Courts of Appeals. (Gov't Resp., at 30–43). The court shall not address these arguments however, as this court cannot "underrule" the Seventh Circuit. *Donohoe v. Consol. Operating & Prod. Corp.* 30 F.3d 907, 910 (7th Cir. 1994) ("Ours is a hierarchical judiciary, and judges of inferior courts *must* carry out decisions they believe mistaken."). Such arguments are better presented to the Court of Appeals itself.

**17.** CIRCUIT RULE 40(e) states:

**Rehearing Sua Sponte Before Decision.** A proposed opinion approved by a panel of this court adopting a position which would overrule a prior decision of this court or create a conflict between or among circuits shall not be published unless it is first circulated among the active members of this court and a majority of them do not vote to rehear en banc the issue of whether the position should be adopted. In the discretion of the panel, a proposed opinion which would establish a new rule or procedure may be similarly circulated before it is issued. When the position is adopted by the panel after compliance with this procedure, the opinion, when published, shall contain a footnote worded, depending on the circumstances, in substance as follows:

This opinion has been circulated among all judges of this court in regular active service. (No judge favored, or a majority did not favor) a rehearing en banc on the question of (e.g., overruling *Doe v. Roe.*)

**18.** At least there is not any evidence to suggest that the *Scialabba* Court followed the dictates of CIR. RULE 40(e) in this particular instance.

**19.** In *United States v. Febus,* the parties did not argue over the make-up of "proceeds" (as that term is used in § 1956(a)(1)). 218 F.3d 784, 789 (7th Cir.2000). Rather, both parties appear to have assumed that "proceeds"

Consequently, there was *nothing* for *Scialabba* to overrule [20] in *Febus*. Therefore, it seems to this court that CIR. RULE 40(e) is irrelevant to the discussion at hand.

■ Ultimately, this case is not, as the government would like this court to believe, about whether one case "overrules" another, or whether *Febus* remains "good law." Rather, the real question here is whether Santos, as a prisoner collaterally attacking his conviction, is entitled to the benefit of the *Scialabba* Court's interpretation of "proceeds," (as used in § 1956(a)(1)), which came after Santos' convictions under § 1956(a)(1) had become final. The answer to this question appears to be "yes," Santos is so entitled.

Courts have long allowed defendants collaterally attacking their conviction the benefit of decisions which give the federal criminal statute under which they were convicted a more narrow reading than had previously been applied at the time of their conviction. *See Schriro v. Summerlin,* —— U.S. ——, 124 S.Ct. 2519, 2522, 159 L.Ed.2d 442 (2004) ("New *substantive* rules generally apply retroactively [on collateral review]. This includes decisions that narrow the scope of a criminal statute by interpreting its terms.") (citation omitted) (emphasis in original); *Bousley,* 523 U.S. at 619–20, 118 S.Ct. 1604 (new interpretations of criminal statutes made after a defendant's conviction under that statute are retroactive on collateral review); *Lanier v. United States,* 220 F.3d 833, 838 (7th Cir.2000) (noting defendant was entitled, even on collateral review, to the benefit of Court's interpretation of a term in 21

U.S.C. § 848 made after defendant's conviction under § 848 had become final); *United States v. Ryan,* 227 F.3d 1058, 1062–63 (8th Cir.2000) (determining that when the Supreme Court narrows the interpretation of a criminal statute enacted by Congress, that interpretation may be applied retroactively to § 2255 claims for post-conviction relief); *United States v. Barnhardt,* 93 F.3d 706, 708 (10th Cir. 1996) (Supreme Court decision defining substantive reach of criminal statute can be applied retroactively to cases on collateral review). The rationale behind such a policy begins with the idea that "a statute, under our system of separate powers of government, *can have only one meaning.*" *Brough v. United States,* 454 F.2d 370, 372–73 (7th Cir.1971) (emphasis added); *accord Bousley,* 523 U.S. at 620–21, 118 S.Ct. 1604 ("[U]nder our federal system it is only Congress, and not the courts, which can make conduct criminal.") (citation omitted). In other words, when a court interprets the scope of an existing criminal statute, that interpretation effectively serves as a declaration of what the statute has always meant. *Gates v. United States,* 515 F.2d 73, 78 (7th Cir.1975). Certainly, if it were any other way, if a statute had a new meaning every time a court saw fit to interpret it, the result would ultimately be that acts covered by the statute might be criminal one day but not the next, and persons committing those acts may or may not be subject to prosecution and imprisonment depending on whether they committed the act pre-interpretation, post-interpretation, or somewhere in-between.

---

equal gross receipts. *Id.* Indeed, from this assumption sprang Santos' argument that his use of illegal "proceeds" to pay the Bolita's collectors and winners merely completed the substantive offense of illegal gambling, and thus did not "promote the carrying on" of the Bolita in violation of § 1956(a)(1)(A)(i). *Id.*

**20.** "A judicial decision is said to be overruled when a later decision, rendered by the same court or by a superior court in the same system, *expresses a judgment upon the same question of law* directly opposite to that which was before given, thereby depriving the earlier opinion of all authority as a precedent." BLACK'S LAW DICTIONARY 1104 (6th ed.1990) (emphasis added).

In any event, considering that a statute can have only one meaning from the date of its effectiveness onward (unless of course, the language of the statute has actually been changed by Congress), then where a court narrows the scope of a statute under which a federal prisoner was previously convicted, there exists the possibility that the prisoner now stands convicted of an act that the law never made criminal. *Bousley,* 523 U.S. at 620, 118 S.Ct. 1604. Thus, as it would be wholly contrary to our notions of justice and fairness to allow a defendant to serve a prison term for an act that is not, nor ever was a crime, defendants collaterally attacking their conviction are therefore entitled to the benefit of decisions which give a federal criminal statute a more narrow reading than had previously been applied to their own conviction under that statute. *Schriro,* 124 S.Ct. at 2522–23; *Bousley,* 523 U.S. at 619–20, 118 S.Ct. 1604; *Lanier,* 220 F.3d at 838; *Ryan,* 227 F.3d at 1062–63; *Barnhardt,* 93 F.3d at 708.[21]

Returning to the case at hand, the fact that the Seventh Circuit only recently interpreted the term "proceeds" in § 1956(a)(1), does not mean that § 1956(a)(1) now means something entirely different than it did before the Court's interpretation. *Gates,* 515 F.2d at 78 ("A statute does not mean one thing prior to . . . interpretation and something entirely

different afterwards."). Rather, the *Scialabba* Court's interpretation of "proceeds" as *net* receipts (versus *gross* receipts) was the law of this Circuit, properly interpreted, at the time of Santos' conviction; it is only that *Scialabba* presented the Seventh Circuit with the first opportunity, since the statute became effective, to decide the question of what constitutes "proceeds." Because the Seventh Circuit's determination that the term "proceeds" only refers to *net* proceeds effectively narrows the interpretation previously applied in Santos' case, there exists the distinct possibility that Santos stands convicted of acts that the law does not make criminal. Thus, Santos is entitled to the benefit of the *Scialabba* Court's interpretation of "proceeds" (as used § 1956(a)(1)), in this collateral proceeding. *See Bousley,* 523 U.S. at 619–20, 118 S.Ct. 1604; *Lanier,* 220 F.3d at 838; *Ryan,* 227 F.3d at 1062–63; *Barnhardt,* 93 F.3d at 708.

Consequently, in order for Santos to be guilty of money laundering under the *Scialabba* Court's interpretation of "proceeds," the money used by Santos in the financial transactions between himself and his couriers and/or winners for purposes of promoting his gambling business must have derived from the *net* proceeds of his illegal gambling business. Although Santos did admit that he used *proceeds* (generally) from his gambling business to pay

---

**21.** As is obvious, many of the cases cited here discuss the application of a post-conviction statutory interpretation to habeas proceedings in terms of "retroactivity." In using the term "retroactive" or "retroactivity," such cases seem to imply that a court's interpretation of a statute somehow *changes* the law. Yet, this is simply not the case as a statute does not mean one thing pre-interpretation and then something entirely different post-interpretation. *Gates v. United States,* 515 F.2d 73, 78 (7th Cir.1975). Ultimately, it seems that many courts discuss statutory cases (like the instant action) in terms of "retroactivity" because it is simply the easiest way to describe

the situation at hand. However, even those courts that approach statutory cases in such a manner note that the implications for retroactivity analysis are quite different from those cases in which a new rule of criminal procedure is announced. *See, e.g., Woodruff v. United States,* 131 F.3d 1238, 1242 (7th Cir. 1997) ("When the Supreme Court is announcing what an existing statute has meant all along, the implications for retroactivity analysis are quite different from the case in which it is announcing for the first time another implication of the provisions of the Constitution that bear on criminal procedure.").

the winners of his Bolita and to pay for the services of his couriers, the constitution of those proceeds (net versus gross) was never determined. *See Febus,* 218 F.3d at 789–90.[22] Nevertheless, after the opinion in *Scialabba*—in which the Seventh Circuit vacated money laundering convictions originally won on facts that, even the government admits, are "indistinguishable" from those presented in Santos' case, (*see* Gov't Resp., at 26)—it clearly appears that the proceeds admittedly used by Santos to pay winners and couriers *could only have been gross* proceeds, *cf. Scialabba,* 282 F.3d at 476 (Court determined that the money laundering convictions of the *Scialabba* defendants, which were based in part upon coin box payments made to bar/restaurant owners, must have depended on "the proposition that gross income is 'proceeds' under the statute."). In using *gross* proceeds from his Bolita to pay couriers and winners, Santos did not, pursuant to the proper interpretation of "proceeds" espoused by the *Scialabba* Court, violate § 1956(a)(1). *See id.* at 478 ("We now hold that the word 'proceeds' in § 1956(a)(1) denotes net rather than gross income of an unlawful venture."). Thus, Santos is currently imprisoned for acts that are not now, nor ever have been crimes. Accordingly, this court hereby **VACATES** Santos' money laundering convictions under § 1956(a)(1)(A)(i) and under § 1956(h).

## IV. CONCLUSION

For the foregoing reasons, Santos' Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 is hereby **GRANTED IN PART.** Efrain Santos' money laundering convictions under § 1956(a)(1)(A)(i) and under § 1956(h) are

**VACATED.** Santo's § 2255 motion is otherwise denied.

This case is hereby set for a status hearing in front of the undersigned on November 4, 2004, at 11:00 a.m. The court **STAYS** the effect of this order until the November 4 hearing.

**SO ORDERED.**

---

**22.** The Court did not determine the character of the proceeds used by Santos to pay winners and couriers because it was never asked to do so. Ultimately, all parties participating in Santos' case seemingly proceeded on the theory that "proceeds" equal gross receipts. *Febus,* 218 F.3d at 789; *see also supra* note 19 and accompanying text.